UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| GLENN-COLUSA IRRIGATION DISTRICT,<br><br>        Plaintiff,<br><br>    v.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS; ASSISTANT SECRETARY OF THE ARMY FOR CIVIL WORKS JO-ELLEN DARCY, in her official capacity; LIEUTENANT GENERAL TODD SEMONITE, in his official capacity; and COLONEL DAVID RAY, in his official capacity,<br><br>        Defendants. | No. 2:17-cv-120 WBS CKD<br><br><u>MEMORANDUM & ORDER RE:<br>DEFENDANTS' MOTION FOR<br>PARTIAL SUMMARY JUDGMENT</u> |

----oo0oo----

Plaintiff Glenn-Colusa Irrigation District brought this action against defendants the United States Army Corps of Engineers ("USACE"), Assistant Secretary of the Army for Civil Works Jo-Ellen Darcy, Lieutenant General Todd Semonite, and Colonel David Ray, alleging that the USACE breached a

1

construction contract by failing to construct an irrigation facility according to the contract's specifications. (Compl. (Docket No. 1).) Before the court is defendants' Motion for Partial Summary Judgment. (Docket No. 44.)

I. Background

Plaintiff is a state government entity and an irrigation district that provides water to farms in Glenn and Colusa counties. (Decl. of Thaddeus Bettner ("Bettner Decl.") ¶ 4 (Docket No. 45-2).) Plaintiff diverts water from the Sacramento River at a pump station near Hamilton City and then conveys that water through a canal to approximately 1,500 landowners. (Id. ¶ 5.) The USACE is a subdivision of the United States Army that builds and maintains infrastructure in the United States. (See US Army Corps of Engineers, http://www.usace.army.mil/About (last visited July 10, 2019).) The individual defendants are Army personnel who oversee USACE operations. (See Compl. ¶¶ 18-20 (Docket No. 1).)

In 1991, the United States brought an Endangered Species Act action against plaintiff in this court. (Pl.'s App. Ex. 2 (Docket No. 46-2).) The government alleged that plaintiff unlawfully took endangered Chinook salmon with defective fish screens at its Hamilton City pump station. (See id. at 1.) After Judge Levi permanently enjoined plaintiff from pumping water during the salmon's migration season, the parties developed a long-term solution and created the Hamilton Fish Screen Project. (Id.) As part of that project, the parties entered into a Project Cooperation Agreement ("PCA") and agreed to co-fund the construction of an irrigation gradient facility designed

to improve the performance of a fish screen plaintiff implemented at the pump station. (Pl.'s App. Ex. 4 (Docket No. 46-4).)

The gradient facility is an in-channel permanent rock structure located near plaintiff's intake channel off the Sacramento River. (Bettner Decl. ¶ 9.) The facility regulates the water surface levels at the pumping station and was engineered to improve performance of the newly-implemented fish screen. (Bettner Decl. ¶ 11.) The facility was designed to help plaintiff meet demand and also ensure compliance with the pumping restrictions imposed due to the prior litigation. (Pl.'s App. Ex. 3 at 15 (Docket No. 46-3).) Congress authorized the construction of the gradient facility in Section 102 of the Energy and Water Development Appropriations Act of 1990, Pub. L. No. 101-101, 103 Stat. 641, 649. This authorization directed the Secretary of the Army, acting through the Chief of Engineers, to complete engineering and design and proceed with construction of the gradient facility.

The PCA sets forth the obligations of the parties with respect to the construction of the gradient facility. (Pl.'s App. Ex. 4.) As a non-federal sponsor, the PCA required plaintiff to contribute a minimum of 25% of total project costs for the facility. (Id. at 5.) Additionally, USACE received funds for the project from Congress on the condition that it expeditiously construct the project, applying the procedures traditionally applied to federal projects pursuant to federal law. (Id. at 4.) The PCA specified that "performance of all work on the Project . . . shall be exclusively within the control of the Government." (Id.)

Part of the PCA, and the focus of defendants' motion, references bank stabilization work near River Mile 208 ("RM 208"). (Id. at 1.) RM 208 is located about two miles upstream from the gradient facility. (Pl.'s App. Ex. 5 at 50:22-25 (Docket No. 46-5).) The PCA refers to RM 208 and notes that congressional authorization for the construction of the gradient facility was modified by Section 305 of the Water Resources Development Act of 1999, Pub. L. No. 106-53, 113 Stat. 269, 299. (Pl.'s App. Ex. 4 at 1.) Citing Section 305, the PCA states that the government may "carry out bank stabilization work in the riverbed gradient facility, particularly, in the vicinity of River Mile 208, if the Assistant Secretary of the Army (Civil Works) determines that such work is necessary to protect the overall integrity of the project, on the condition that additional environmental review of the project is conducted, which work, if approved may be reflected in an amendment to this Agreement." (Id.)

In 2001, the parties executed a Schedule and Cost Change Request to complete engineering reports and environmental assessments "to evaluate alternatives for the RM 208 bank stabilization feature of the gradient facility project." (Pl.'s App. Ex. 8 (Docket No. 46-8).) In the years after, the USACE contracted with outside parties to complete the referenced engineering and environmental work. (See Pl.'s App. Exs. 9-15 (Docket Nos. 46-9 to 46-17).) Ultimately, plaintiff admits that the Assistant Secretary of the Army made no determination that bank stabilization work was necessary to protect the overall integrity of the gradient facility project and the parties did

4

not execute an amendment to the PCA to include such work at RM 208. (Decl. of Benjamin Hall ("Hall Decl.") Ex. A at 6 (Docket No. 44-3).)

After the parties were unable to resolve the issues they had with the project, plaintiff brought an action against the government in the Court of Federal Claims, alleging that the United States breached the PCA by failing to construct the gradient facility according to the PCA's specifications. See Glenn-Colusa Irrigation Dist. v. United States, 129 Fed. Cl. 593 (2016). The Court of Federal Claims dismissed that action for lack of jurisdiction. Id. at 599.

In January 2017, plaintiff filed this action, alleging causes of action against defendants for: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) breach of implied warranty, (4) declaratory judgment, and (5) violation of the Administrative Procedure Act. (Compl. ¶¶ 20-26.)[1] Plaintiff alleges, as one of its categories of project defects, that USACE failed to construct improvements at RM 208. (Id. ¶¶ 84-89.) Defendants now seek summary judgment as to all claims arising out of the alleged failure to conduct bank stabilization efforts near RM 208.[2]

---

[1] This court previously denied defendant's motion to dismiss certain claims on the grounds that they were barred by the applicable statute of limitations. See Glenn-Colusa Irrigation Dist. v. U.S. Army Corps of Eng'rs, No. 2:17-cv-0120 WBS GGH, 2017 WL 2779012 (E.D. Cal. June 27, 2017).

[2] The complaint does not clearly outline what claims pertain to the alleged defects at RM 208. Accordingly, the court assumes that plaintiff alleges all of its claims as to this alleged defect.

## II. Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). Alternatively, the movant can demonstrate that the non-moving party cannot provide evidence to support an essential element upon which it will bear the burden of proof at trial. Id. Any inferences drawn from the underlying facts must, however, be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III. Discussion

Federal law governs contract interpretation where the United States is a party. Mohave Valley Irrigation & Drainage Dist. v. Norton, 244 F.3d 1164, 1165 (9th Cir. 2001). The content of federal law is derived from general federal common law. United States Postal Serv. v. Ester, 836 F.3d 1189, 1195 (9th Cir. 2016). In interpreting and applying federal common

law, courts should be "guided by general principles of contract law and by the Restatement." First Interstate Bank of Idaho v. Small Bus. Admin., 868 F.2d 340, 343 (9th Cir. 1989) (alteration in original). Another source of traditional common law principles is "the content of the forum state's law." Glenn-Colusa, 2017 WL 2779012, at *3 (citations and quotations omitted).

The interpretation of a contract is a mixed question of law and fact. Tehama-Colusa Canal Auth. v. U.S. Dep't of the Interior, 721 F.3d 1086, 1093 (9th Cir. 2013). However, "the determination of whether contract language is ambiguous is a question of law." Klamath Water Users Protective Ass'n v. Patterson, 204 F.3d 1206, 1210 (9th Cir. 1999). Contract interpretation starts with the language of the written agreement. Id. The contract "must be read as a whole and every part interpreted with reference to the whole, with preference given to reasonable interpretations." Id. If the provisions of a contract are clear and unambiguous, they must be given their ordinary meaning. Tehama-Colusa, 721 F.3d at 1093.

A. Breach of Contract Claim

A breach of contract claim requires (1) the existence of a valid contract, (2) an obligation under the contract, (3) a breach of that duty, and (4) damages caused by the breach. See CDF Firefighters v. Maldonado, 158 Cal. App. 4th 1226, 1239 (5th Dist. 2008); San Carlos Irrigation & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989). Plaintiff argues that defendants did not perform their contractual obligation to carryout bank stabilization work at RM 208. Plaintiff insists

that such an obligation exists because evidence demonstrates that RM 208 is integral to the gradient facility project.

Here, the express terms of the PCA, the contract at issue in this case, define the obligations of the parties and the scope of the gradient facility project. Article II-A of the PCA requires that the government "expeditiously construct the project," applying the procedures traditionally applied to federal projects. (See Pl.'s App. Ex. 4 at 4.) And Article I-A of the agreement states that:

> The term "Project" shall mean the Riverbed Gradient Facility Project for the Sacramento River at the GCID Intake, California, which shall be operated in an integrated fashion with the Hamilton City Pumping Plant Fish Screen Improvement Project. The Riverbed Gradient Facility is designed with the general characteristics of a natural riffle and consists of three sheet pile cutoff walls and rock riprap revetment along the channel bed and banks as generally described in the Limited Reevaluation Report titled, "Gradient Facility Limited Reevaluation Report, Riverbed Gradient Facility for the Sacramento River at the GCID Intake, California," dated, March 1998 and approved by Director of Civil Works, on 21 April 1998.

(See id. at 2.) Nothing within the quoted language mentions RM 208. Likewise, plaintiff agrees that the project, as defined in the PCA, does not include bank stabilization at RM 208. (See Hall Decl. Ex. A at 5.) Moreover, the operative part of the contract does not obligate defendants to take any action related to RM 208.

In fact, the PCA contains only a single reference to RM 208, which is in the contract's recitals. (See Pl.'s App. Ex. 4 at 1; see also Hall Decl. Ex. A at 6 (plaintiff admitting that a recital to the PCA contains the relevant reference to RM 208).) Recitals in a contract "are merely explanations of the

circumstances surrounding the execution of the contract." See Mozdzierz v. Accenture, LLP, No. 06-cv-3877, 2010 WL 4273323, at *6 (E.D. Pa. Oct. 29, 2010) (citation omitted). Recitals are generally given limited effect and do not form any part of the real agreement. See Emeryville Redevelopment v. Harcros Pigments, Inc., 101 Cal. App. 4th 1083, 1101 (1st Dist. 2002); see also Grynberg v. F.E.R.C., 71 F.3d 413, 416 (D.C. Cir. 1995) ("[I]t is standard contract law that a Whereas clause, while sometimes useful as an aid to interpretation, cannot create any right beyond those arising from the operative terms of the document."). Their relevance is confined to giving meaning to certain parts of a contract that may otherwise be ambiguous. See Hunt v. United Bank & Tr. Co., 210 Cal. 108, 115 (1930). Ultimately, if the operative part of a contract is clear, that meaning controls. See Powertech Tech., Inc. v. Tessera, Inc., No. 10-cv-945 CW, 2013 WL 12324116, at *10 (N.D. Cal. Apr. 15, 2013) (citing 17A Am. Jur. 2d Contracts § 383).

        The operative part of the agreement is clear in this case. Plaintiff cannot point to any portion of the PCA that is otherwise ambiguous and that would be clarified by the reference to RM 208 in the recitals. The agreement explicitly sets forth the obligations of each party and provides a definition of the scope of the project. Regardless, the court cannot ascertain any relevant promise made on the part government in this recital. The recital merely notes that "the Government *may* carry out bank stabilization work . . . *if* the Assistant Secretary of the Army (Civil Works) *determines* that such work is necessary to protect the overall integrity of the project." (Pl.'s App. Ex. 4 at 1

9

(emphasis added).) The recital merely restates defendants' authority under the Water Resources Development Act of 1999 and emphasizes that performing such work remains within the Assistant Secretary's discretion, outside of the promises made in the operative portion of the agreement.

In hopes of creating a factual dispute, plaintiff makes two arguments in support of its contention that defendants had contractual obligations related to RM 208. First, plaintiff argues that defendants would not have performed all the previously-mentioned engineering and environmental work if it had no obligation to do so. Second, plaintiff provides evidence that USACE used funds earmarked for this project and provided by plaintiff pursuant to its cost-sharing obligation under the PCA for work on RM 208. (See Pl.'s App. Exs. 16 & 17 (Docket Nos. 46-18 & 46-19).)

Plaintiff's argument that the government would not have performed the work if it did not have an obligation to do so is a non-sequitur. The evidence merely shows that the government inquired into the appropriateness of bank stabilization work at RM 208. Indeed, before defendants could undertake such work, under Section 305 of the Water Resources Development Act of 1999, the Assistant Secretary had to first determine that such work is necessary to the overall project and conduct environmental review. In the absence of language from the PCA that supports the existence of an obligation, the court cannot conclude that the authorization for the engineering and environmental work was anything but an exercise of the Assistant Secretary's discretionary authority under this statute.

Plaintiff's second argument, that the USACE used funds meant for the project, relies on letters sent to plaintiff from government officials. The cited evidence shows that the government asked for required cash contributions under the PCA to fund contracts for RM 208 engineering design reports and environmental documentation. (See id.) The letters mention plaintiff's cash contribution share of 25% (see id.), which is the exact share specified in the PCA (see Pl.'s App. Ex. 4 at 5). However, this evidence is not enough to establish that RM 208 was the subject of any contractual obligations. Generally, extrinsic evidence like these letters "is inadmissible to contradict a clear contract term." Pierce Cty. Hotel Emps. & Rest. Emps. Health Tr. v. Elks Lodge, B.P.O.E. No. 1450, 827 F.2d 1324, 1327 (9th Cir. 1987). While California law states that extrinsic evidence may be used to prove a meaning of a term that is otherwise unambiguous on its face, the offered evidence should "prove a meaning to which the language of the instrument is reasonably susceptible." Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co., 69 Cal. 2d 33, 37 (1968).

Here, the meaning of the term "project" in the PCA cannot reasonably be construed to include work at RM 208. The scope of the project is defined in terms of the gradient facility structure. (See Pl.'s App. Ex. 4 at 2.) Similarly, the PCA enumerates in detail "total project costs," yet it makes no mention of costs for bank stabilization work. (See id. at 3.) Instead, the type of costs listed relate to the construction of the actual facility, not work upstream. (See id.) Further, plaintiff cannot argue that the parties could not have

11

anticipated including references to bank stabilization work in these definitions. As explained previously, the PCA refers to RM 208 in its recitals without identifying any legal rights and obligations related to that work.

Although plaintiff made cost contributions related to RM 208, its remedy at the time would have been to contest its obligation to contribute funds. Plaintiff cannot use its then-acquiescence to expand the scope of the contract beyond what the plain language of the agreement supports. See Pace v. Honolulu Disposal Serv., Inc., 227 F.3d 1150, 1158 n.10 (9th Cir. 2000) (courts cannot "admit[] parol evidence that is wholly inconsistent with the terms of [the agreement]").

Even if these letters establish that RM 208 is included in the scope of the project, nothing in the PCA required defendants to perform bank stabilization work at RM 208. The only mention of RM 208 in the agreement is language emphasizing the Assistant Secretary's discretion under the relevant statute to authorize such work. (See Pl.'s App. Ex. 4 at 1.)[3] Consistent with this statutory authority, defendants simply explored the necessity of any work at RM 208. Because the agreement did not place any limits on the Assistant Secretary's

---

[3] The PCA also states that such work "if approved may be reflected in an amendment to this Agreement." (Id.) If the PCA already required defendants to conduct bank stabilization work at RM 208, any further amendment would be unnecessary, and this language would be superfluous. Such a reading is inconsistent with basic principles of contract interpretation. See Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc., 971 F.2d 272, 278-79 (9th Cir. 1992) ("It is well settled that a contract should be interpreted so as to give meaning to each of its provisions.").

12

discretion, the court cannot independently determine whether the exercise of that discretion was reasonable. See United States v. Basin Elec. Power Co-op., 248 F.3d 781, 797 (8th Cir. 2001) ("[W]here a contract gives broad discretion . . . to one of the parties," it is inappropriate to "rewrite the bargained-for-terms of the contract by limiting the [] party's discretion."). Therefore, as a matter of law, the Assistant Secretary's discretionary decision not to authorize bank stabilization work at RM 208 is not a breach of the PCA.

Accordingly, the court must dismiss plaintiff's breach of contract claim with respect to RM 208.

B. Plaintiff's Remaining Claims Related to RM 208

Plaintiff cannot use any implied covenants, such as the implied covenant of good faith and fair dealing, to create an obligation related to RM 208. As explained previously, the project as defined by the agreement did not include RM 208 and, even if it did, the PCA did not otherwise require defendants to complete bank stabilization work there. The implied duty of good faith and fair dealing, the only implied covenant mentioned in plaintiff's opposition, "cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions." Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 831 (Fed. Cir. 2010); see also Racine & Laramie, Ltd. v. Dep't of Parks & Recreation, 11 Cal. App. 4th 1026, 1032 (4th Dist. 1992) ("[T]he implied covenant is limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated in the contract."). For the reasons

13

given previously, construing an implied covenant to require certain actions on the part of defendants related to RM 208 runs counter to the very terms of the PCA.

Lastly, plaintiff fails to defend in its opposition any claims it may have related to RM 208 for breach of implied warranty and violations of the Administrative Procedure Act. The court cannot identify any independent legal support for these claims. Accordingly, because plaintiff has no claim with respect to RM 208, the court must also dismiss the related request for declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201. In order to be entitled to relief under the Declaratory Judgment Act, the party must have a viable underlying claim. See City of W. Sacramento v. R & L Bus. Mgmt., No. 2:18-cv-900 WBS EFB, 2019 WL 2249630, at *4 (E.D. Cal. May 23, 2019) (citations omitted).

IT IS THEREFORE ORDERED that defendants' Motion for Partial Summary Judgment (Docket No. 44) be, and the same hereby is, GRANTED.

Dated: July 18, 2019

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

14